IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MELODY PAK, ALI PAK, MARYAM FATOURAEI,
VAHID FATOURAEE, KAMBIZ FATHINEJAD,                    OPINION AND ORDER
ARMIN FATHINEJAD, and JOHN DOES 1 and 2,
                                                              22-cv-250-slc
                              Plaintiffs,

        v.

JOSEPH BIDEN *et al.*,

                              Defendants.

---

Plaintiffs are four Iranian nationals who unsuccessfully applied for visas from outside the United States, three U.S. citizens who filed family-based petitions on behalf of their visa-applicant relatives, and one lawful permanent resident who has not filed a petition on behalf of their visa-applicant relative. Defendants include the President of the United States and several federal officers responsible for investigating, processing, and/or adjudicating immigrant visa petitions.

The applications of the visa-applicant plaintiffs were denied on terrorism-related inadmissibility grounds (TRIG) due to their prior service in the Islamic Revolutionary Guard Corps (IRGC). Plaintiffs allege that defendants are responsible for systemic failures that deprived them or their relatives of the opportunity to establish their eligibility for a TRIG exemption under 8 U.S.C. § 1182(d)(3)(B). They have brought claims under the Administrative Procedure Act (APA), the doctrine announced in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) (requiring agencies to follow their own rules and procedures), and the Due Process Clause of the Fifth Amendment, and they seek a writ of mandamus for an unlawfully withheld action. Before the court is defendants' motion to dismiss the visa-applicant plaintiffs

under Fed. R. Civ. P. 12(b)(1) for lack of standing and motion to dismiss plaintiffs' complaint under Rule 12(b)(6) for failure to state a claim.  Dkt. 16.

For the reasons below, I find that the visa-applicant plaintiffs have standing to bring this lawsuit, but that this action is barred by the doctrine of consular nonreviewability. There is ample room to disagree with the various decisions reached by the Executive Branch, but under the nonreviewability doctrine, this is irrelevant to the analysis.  I am denying defendants' Rule 12(b)(1) motion, but I am granting their Rule 12(b)(6) motion and dismissing this case for failure to state a claim.

## BACKGROUND

Under the Immigration and Nationality Act (INA), foreign nationals seeking a visa to enter the United States have the burden of establishing their eligibility for the visa and admissibility to the United States.  8 U.S.C. § 1361.  Nonimmigrant visas are usually issued for temporary visits, such as for tourists, students, fiancé(e)s, and certain types of temporary workers, whereas immigrant visas are for those seeking permanent residence in the United States with a path to citizenship.  *See* 8 U.S.C. § 1101(a)(15).  Generally, the visa process starts with a petition filed with the United States Citizenship and Immigration Service (USCIS) on behalf of the foreign national.  If USCIS approves the petition, then the noncitizen-beneficiary may apply for a visa.  *See* 8 U.S.C. §§ 1201(a), 1202(a), 1202(c).  USCIS sends the petition to the National Visa Center to prepare the case for a visa application at the designated U.S. embassy or consulate.  8 U.S.C. § 1202(a); 22 C.F.R. § 42.61 *et seq*.  The applicant must appear for an

in-person interview with a Department of State consular officer.  *See* 8 U.S.C. § 1202(e), (h); 22 C.F.R. § 42.62(b).

Consular officers are tasked with determining whether a visa applicant has met their burden.  8 U.S.C. § 1201(a)(1).  A consular officer must provide notice to the noncitizen applicant that "states the determination," and "lists the specific provision or provisions of law" under which the consular officer refused the visa application.  8 U.S.C. § 1182(b)(1).  Section 1182(b)(1) "does not apply," however, if the consular officer refuses the visa under sections 1182(a)(2) ("Criminal and Related Grounds") or (a)(3) ("Security and Related Grounds," including terrorism).  8 U.S.C. § 1182(b)(3).

In general, a visa applicant who has been associated with a terrorist organization is inadmissible under Terrorism-Related Inadmissibility Grounds (TRIG):

> Any alien who--
>
> > (I) has engaged in a terrorist activity;
> >
> > (II) a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in or is likely to engage after entry in any terrorist activity (as defined in clause (iv));
> >
> > (III) has, under circumstances indicating an intention to cause death or serious bodily harm, incited terrorist activity;
> >
> > (IV) is a representative (as defined in clause (v)) of–
> >
> > > (aa) a terrorist organization (as defined in clause (vi)); or
> > >
> > > (bb) a political, social, or other group that endorses or espouses terrorist activity;

3

(V) is a member of a terrorist organization described in subclause (I) or (II) of clause (vi);

(VI) is a member of a terrorist organization described in clause (vi)(III), unless the alien can demonstrate by clear and convincing evidence that the alien did not know, and should not reasonably have known, that the organization was a terrorist organization;

(VII) endorses or espouses terrorist activity or persuades others to endorse or espouse terrorist activity or support a terrorist organization;

(VIII) has received military-type training (as defined in section 2339D(c)(1) of Title 18) from or on behalf of any organization that, at the time the training was received, was a terrorist organization (as defined in clause (vi)); or

(IX) is the spouse or child of an alien who is inadmissible under this subparagraph, if the activity causing the alien to be found inadmissible occurred within the last 5 years, is inadmissible.

8 U.S.C. § 1182(a)(3)(B)(I).  *See also* 8 U.S.C. § 1201(g).

The INA defines "terrorist organization" as an organization:

(I) designated under [8 U.S.C. §] 1189;

(II) otherwise designated, upon publication in the Federal Register, by the Secretary of State in consultation with or upon the request of the Attorney General or the Secretary of Homeland Security, as a terrorist organization, after finding that the organization engages in [terrorist] activities . . . ; or

(III) that is a group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, [terrorist] activities[.]

8 U.S.C. § 1182(a)(3)(B)(vi).

The organizations described in subclause I are generally known as Tier I terrorist organizations, in subclause II as Tier II organizations, and in subclause III as Tier III organizations.  Unlike Tier

4

I and Tier II organizations—which have been formally designated as terrorist organizations—consular officers determine whether an organization falls within the definition of an undesignated or Tier III terrorist organization on a case-by-case basis.  *See* § 1182(a)(3)(B)(vi)(III).

On April 8, 2019, DOS designated the Iranian Revolutionary Guard Corps (IRGC) a foreign terrorist organization, making it a Tier I organization.  *See In re Designation of the IRGC (and other Aliases) as a Foreign Terrorist Organization*, 84 Fed. Reg. 15278 (Apr. 15, 2019).  Under this designation, consular officers began refusing to issue visas to Iranian visa applicants who had served in the IRGC, citing § 1182(a)(3)(B).  Foreign nationals who served in the IRGC before it was designated as a terrorist organization are inadmissible unless they are granted an exemption.

The INA provides the Executive Branch the discretionary authority to grant waivers and exemptions to certain individuals and groups alleged to have been involved with terrorist organizations.  *See* 8 U.S.C. §§ 1182(d)(3)(A) (waivers for nonimmigrant visa applicants) and (B)(I) (exemptions for immigrant and nonimmigrant visa applicants); 9 FAM 302.6-2(B)(5)(a) and (b)(1) (DOS's Foreign Affairs Manual, accessed at https://fam.state.gov/fam/09FAM/09FAM 030206.html).

Relevant to this case is the exemption provision in § 1182(d)(3)(B)(I), which authorizes the Secretaries of State and Homeland Security, after consultation with each other and the Attorney General, to determine in their "sole unreviewable discretion" that § 1182(a)(3)(B) should not apply to an applicant.  According to the Foreign Affairs Manual, exemptions cannot be granted to "applicants who voluntarily and knowingly received military-type training from

a Tier I or II terrorist organization (INA 212(a)(3)(B)(i)(VIII)))." 9 FAM 302.6-2(B)(5)(b)(2)(f).
"By including 'voluntarily or knowingly' in the statute, Congress made clear that exemptions
may be used to overcome ineligibility for past terrorist activity associated with a designated (Tier
I or II) terrorist organization if the applicant acted under duress or without the relevant
knowledge." 9 FAM 302.6-2(B)(5)(b)(4).


## FACTUAL ALLEGATIONS

### I.  The Parties

Plaintiff Melody Pak is a U.S. permanent resident residing in Madison, Wisconsin, and
her father, plaintiff Ali Pak, is an Iranian national residing in Tehran, Iran.  Plaintiff John Doe
1 is a U.S. citizen residing in Lake Zurich, Illinois, and his fiancé, plaintiff John Doe 2, is an
Iranian national residing in Iran.  Plaintiff Maryam Fatouraei is a U.S. citizen residing in
Lexington, Massachusetts, and her father, plaintiff Vahid Fatouraee, is an Iranian national
residing in Oroumiyeh, Iran.  Plaintiff Kambiz Fathinejad is a U.S. citizen residing in Cincinnati,
Ohio, and his son, plaintiff Armin Fathinejad, is an Iranian national residing in Shiraz, Iran.
Defendants are federal officials being sued in their official capacities who are collectively
responsible for implementing the INA, ensuring the government's compliance with federal laws,
and processing, adjudicating, and issuing visas and TRIG exemptions:

- Defendant Joseph R. Biden, President of the United States, directs
  and oversees the executive branch, including the executive agencies
  and officials included as defendants in this action.

- Defendant Merrick Garland is the U.S. Attorney General and directs
  the Department of Justice (DOJ).

- Defendant Christopher A. Wray is the Director of the Federal Bureau of Investigation (FBI), which is a component agency of DOJ responsible for completing background and security checks on applicants for immigration benefits.

- Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security (DHS) and is responsible for overseeing the department's component agencies.

- Defendant Antony Blinken is the U.S. Secretary of State and oversees the Department of State (DOS), which is responsible for processing visa applications.

- Defendant Gentry Smith is the Assistant Secretary of the Bureau of Diplomatic Security, which houses the Diplomatic Security Service (DSS).  DSS is the federal law enforcement and security bureau of DOS and is responsible for investigations performed abroad.

- Defendant Sean Murphy is the Chargé d'Affaires to the U.S. Embassy in Abu Dhabi, United Arab Emirates.  The embassy is responsible for adjudicating and issuing immigrant visas and adjudicated Ali Pak's and John Doe 2's visa applications.

- Defendant Lynne M. Tracy is the U.S. Ambassador to Armenia and is responsible for and oversees the activities of foreign service officers and U.S. agencies in Armenia.

- Defendant William Laitinen is Deputy Chief of Mission to the U.S. Embassy in Yerevan, Armenia, which adjudicated the visa applications of Vahid Fatouraee and Armin Fathinejad.

## II.  Denial of Plaintiffs' Visa Applications

All of the visa-applicant plaintiffs were denied visas under TRIG based on their service in the IRGC prior to 2019.  Plaintiffs allege that when the visa-applicant plaintiffs requested that they be considered for a TRIG exemption, defendants provided inconsistent responses as to how or whether they could apply and be considered.  At no time during the normal visa application process were the applicants prompted or given the opportunity to provide evidence

of their eligibility for a TRIG exemption, and defendants did not provide any public guidance on how applicants could request consideration for an exemption.

### A. Pak Plaintiffs

On August 1, 2013, at the age of 54, Ali Pak filed an immigrant visa petition with USCIS based on his exceptional ability as a research scholar whose work is in the U.S. national interest. USCIS approved his petition on February 6, 2014 and forwarded it to the National Visa Center. The U.S. Embassy in Abu Dhabi, UAE scheduled Pak for an interview on March 12, 2018.  At the interview, his visa was temporarily refused pending a security clearance.  Defendants then sat on Pak's case for the next two years.  On March 5, 2020—almost a year after DOS designated IRGC as a terrorist organization—Pak received a denial letter indicating that he was found inadmissible under TRIG, and that no waiver was available for the grounds of ineligibility.

On February 15, 2021, Pak's attorney, Shabnam Lotfi, emailed the embassy to request that Pak be considered for a TRIG exemption under 9 FAM 302.6-2(B)(5)(U), arguing that Pak did not know, and should not reasonably have known, that a branch of Iran's military would be designated a terrorist organization approximately 40 years after his completion of mandatory military service.  The embassy responded that Pak's visa application was refused because he has been found ineligible to receive a visa under TRIG and no waiver is available for the grounds of ineligibility.  Lofti emailed back, stating that Pak was not asking for a waiver but for an exemption.

On December 11, 2021, Lofti repeated his request that Pak be considered for an exemption, but he received no response.  At no point throughout the visa application process

did the embassy ask Pak about his military service or give him the opportunity to demonstrate that his military service was not voluntary or knowingly terrorist activity.

### B.  Doe Plaintiffs

On January 6, 2017, John Doe 1 filed a nonimmigrant fiancé visa petition with USCIS on behalf of John Doe 2.  USCIS approved the petition on April 24, 2017, and forwarded it to the National Visa Center.  The U.S. Embassy in Abu Dhabi, UAE scheduled Doe 2 for an interview on August 16, 2017.  At the interview, his visa was temporarily refused pending further background checks.  In the meantime, the IRGC designation occurred.  Having lost patience with the wait, the couple filed suit to compel adjudication of the visa application on April 19, 2019.  On February 11, 2020, the embassy denied John Doe 2's visa application under TRIG.

Lofti, on behalf of the Does, began a two-year back and forth via email with Abu Dhabi's Immigrant Visa Unit Chief, requesting that the embassy consider Doe 2 for a TRIG exemption.  Lofti detailed Doe 2's service in the IRGC fifteen years prior, noted that Doe 2 had not received any weapons training and was assigned to paint and wash dishes, and emphasized that Doe 2 could not have known that his compulsory service with his nation's military would be deemed terrorist activity years in the future.  He also explained that Doe 2 is a gay man in a same-sex relationship with an American citizen and lives in a country that considers his sexuality punishable by death.  The unit chief responded, requesting that Doe 2 provide a copy of his new passport as his old one had expired, and that Doe 2 answer supplemental questions about the names of all siblings; details on all trips taken during the past fifteen years, including locations

visited, date visited, source of funds, and length of stay; the usernames for all social media accounts; all email addresses; and additional information.  Plaintiffs provided the requested information.

In December 2020, the unit chief responded that "[a]fter review of the request of a waiver of ineligibility under INA [212(a)]3(B), we request a re-interview with your client so that we can discuss in detail, under oath, his experience with IRGC." Dkt. 1-8 at 5.  Doe 2 attended a second interview on July 5, 2021, but he was not given a visa.  In response to Doe 1's request for further information, the unit chief explained in an email that:

> The Secretaries of Homeland Security and State, in consultation with each other and the Attorney General, each are authorized to conclude, in their sole and unreviewable discretion, that almost any of the terrorism-related provisions under INA 212(a)(3)(B) should not apply to an alien. In other words, this decision is not/not [*sic*] made in our consular section. This is outlined in detail in the Foreign Affairs Manual (see 9 FAM 302.6-2(B)(5) (U) Exemptions).

> Indeed, we would not have invited [John Doe 2] today if we did not think we could pursue a waiver of [TRIG] ineligibility based on his IRGC conscription. [John Doe 2] provided our officers today with valuable context on his military service in Iran. We will use the information he provided today to plan our way forward with our colleagues in Washington. I will stay in touch with you when I have additional information. I have no insight into the speed in which this will be handled or processed but be assured that we are now working on it.

> Dkt. 1-8 at 8.

Lofti emailed the unit chief on a monthly basis between August 2021 and January 2022 for updates but received little to no information.  In November 2021, the unit chief stated that department attorneys were still considering the waiver recommendation, but the Doe plaintiffs have heard nothing since that time.

### C.  Fatouraee and Fatouraei Plaintiffs

On September 26, 2016, Maryam Fatouraei filed a family-based immigrant visa petition with USCIS on behalf of her father, Vahid Fatouraee.  USCIS approved the application, and the U.S. Embassy in Yerevan, Armenia scheduled Fatouraee for an interview on November 24, 2020.  At the interview, Fatouraee was given a denial letter indicating that he had been found inadmissible under TRIG and that no waiver is available for ineligibility grounds.

Fatouraee had completed mandatory military service with the IRGC between 1979 and 1980, four decades before IRGC was designated a terrorist organization and the same year that IRGC was founded.  On November 9, 2021, Fatouraee requested through counsel (Lofti) that he be considered for a TRIG exemption, but the embassy responded:

> The waiver for the [TRIG] refusal is requested through the State Department and must be granted by the Department of Homeland Security.
>
> Visa applicants who are applying for a waiver of a ground of inadmissibility should file the Application for Waiver by mail with a USCIS domestic Lockbox facility. Please see the instructions on the USCIS website.
>
> Also please note that it is the person's responsibility to file and send the fee to the lockbox.
>
> Dkt. 1-10 at 3.

According to plaintiffs, Fatouraee received incorrect advice:  the application referenced by the embassy is Form I-601, Application for Waiver of Grounds of Inadmissibility, and TRIG is not one of the grounds that the I-601 waiver forgives.  Instead, for an exemption, the unit chief must seek concurrence from DHS in Washington.

Lofti explained in emails to the embassy and later to the Legal Advisor for Counselor Affairs (LegalNet) that the embassy had incorrectly advised Fatouraee to file a waiver application with USCIS, and he requested clarification on the process for requesting an exemption. The embassy did not indicate that it had requested or received concurrence from DHS, and LegalNet stated that it was unable to provide further information regarding the refusal of the visa application under TRIG.

### D. Fathinejad Plaintiffs

Plaintiff Kambiz Fathinejad submitted a petition for an immigrant visa for his son, Armin, in September 2011. USCIS approved the application, and the embassy in Yerevan, Armenia scheduled Armin for an interview on September 19, 2019. At the interview, Armin was informed that his application was refused pending further processing and background checks.

Three months later, Armin emailed the embassy asking for an update on his case, and the embassy responded that it was still being reviewed. In January 2020, the embassy requested that Armin complete an "extreme vetting" questionnaire, asking him to provide: the names of all siblings; details on all trips taken during the past fifteen years, including locations visited, date visited, source of funds, and length of stay; the user names for all his social media accounts; all email addresses; and additional information. Armin responded with the requested information.

Armin continued to email the embassy throughout 2020, asking for an update on his case. On December 2, 2020, the embassy emailed Armin a letter refusing his visa under TRIG. Armin responded that he would like the embassy to consider his case as an exception because his military service in IRGC was compulsory and had occurred 13 years previously. The embassy

responded that his application had been refused under TRIG after a thorough review and that there is no waiver for immigrant visa applicants. Armin repeated his request for an exception in March 2021, but the embassy did not respond.

In November 2021, Armin emailed the embassy to ask that his case be considered for an exception because his service with the IRGC was not voluntary and had occurred 14 years ago. The embassy responded that a TRIG waiver must be requested through DOS and granted by DHS. It also advised him, incorrectly, that visa applicants who are applying for a waiver of a ground of inadmissibility should file an Application for Waiver by mail with a USCIS domestic lockbox facility.

## OPINION

Plaintiffs contend that the lack of an accessible or consistent process for considering TRIG exemptions has caused the visa-applicant plaintiffs and their relatives to live in limbo, and that defendants' legally incorrect advice about the exemption process compounds the harm. They bring this lawsuit under the Constitution and various federal laws to compel defendants to develop a transparent TRIG exemption process that is applied consistently across consular posts and to plaintiffs. Defendants challenge the complaint under Rule 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a claim. I address defendants' arguments separately below.

## I. Standing

Defendants contend that the claims brought by the visa-applicant plaintiffs[1] must be dismissed for lack of standing under Rule 12(b)(1). *See Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015) (complaint must plausibly allege standing to survive Rule 12(b)(1) challenge); *Scruggs v. Nielsen*, 2019 WL 1382159, at *1 (N.D. Ill. Mar. 27, 2019) (same). To establish Article III standing, a litigant "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (internal citations omitted). An injury in fact requires "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). To be concrete, the injury "must be de facto; that is, it must actually exist." *Id.* at 340 (internal quotation omitted). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).

Defendants' primary argument is that the visa-applicant plaintiffs cannot show a legally protected interest because the Supreme Court has held that "foreign nationals seeking admission have no constitutional right to entry." *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018); *see also Hazama v. Tillerson*, 851 F.3d 706, 708 (7th Cir. 2017) (citing *Kleindienst v. Mandel,* 408 U.S.

---

[1] Defendants do not challenge the standing of the family-member plaintiffs. Although "[w]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented," *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012), it is unnecessary to consider the standing of the family-member plaintiffs because, as explained below, I find that the visa-applicant plaintiffs have standing. *See Ezell v. City of Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011) ("Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not.").

753, 770 (1972)) ("The Supreme Court has consistently recognized that unadmitted, nonresident aliens have no free-standing constitutional right to enter the United States."). However, the Court of Appeals for the Seventh Circuit rejected this argument in *Matushkina v. Nielsen*, 877 F.3d 289 (7th Cir. 2017). There, a nonresident Russian citizen brought an APA action seeking review of an inadmissibility determination by U.S. Customs and Border Protection (CPB) officials that later served as the basis for the denial of her immigrant visa application. The court of appeals noted that "[t]he line between a lack of standing and a failure to state a claim for relief on the merits can be a fine one," particularly where "the lead plaintiff does not have a legal right enforceable in federal court." *Id.* at 292. In such cases, it is not always obvious whether the problem is a lack of standing or lack of a viable claim on the merits. *Id.*

In *Matushkina*, the court of appeals held that for standing purposes, the legally-protected "interest at issue need not rise to the level of a right, let alone a constitutional right," and "[a] right of entry . . . is not a prerequisite to standing in the case of someone seeking entry to the United States." *Id.* at 293 (internal citations omitted). In support, the court cited its holdings in (1) *Musunuru v. Lynch*, 831 F.3d 880, 882 n.1 and 891 (7th Cir. 2016), that an employee beneficiary of an employer's I-140 petition had constitutional standing to challenge revocation of a previously-approved petition, even though the employee had no Fifth Amendment liberty or property interest in the petition's validity; and (2) *Garcia v. Sessions*, 873 F.3d 553, 556 (7th Cir. 2017), that the denial of a statutory right to apply for asylum was an injury even though there is no due process right to asylum. *Id.*

15

Defendants attempt to distinguish *Matushkina* on the facts. They argue that the plaintiff in that case had been granted a visa that was later cancelled, whereas in the instant case, none of the visa-applicant plaintiffs has ever been granted a visa, thus making their injury much more attenuated than the injury at play in *Matushkina*. *See* dkt. 17 at 14. Defendants then point to *Thatikonda v. U.S. Dep't of Homeland Sec.*, 2022 WL 425013, at *4 (D.D.C. Feb. 11, 2022), as an example of a fact pattern that *did* cause the court to find standing, but which, according to defendants, is materially different from the fact pattern in the instant case.[2] I am not persuaded by defendants' argument.

First, the court in *Matushkina* did not base its standing decision on the fact that the nonresident plaintiff had once been approved for a visa. Second, although defendants correctly note that the district court in *Thatikonda* found plaintiff's past connection to the U.S. significant for standing purposes, the court also recognized that it and other courts—including the Seventh Circuit—recognized that the loss of "'a significant opportunity to receive an immigrant visa . . . is itself a concrete [and cognizable] injury.'" *Thatikonda*, 2022 WL 425013, at *4 (quoting *Rossville Convenience & Gas, Inc. v. Garland*, 2021 WL 5865446, at *7 (D.D.C. Dec. 10, 2021), and citing *Matushkina*, 877 F.3d at 293)); *see also Kurapati v. U.S. Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1259-61 (11th Cir. 2014) (deprivation of opportunity to apply for adjustment of status is injury); *Patel v. U.S. Citizenship & Immigration Servs.*, 732 F.3d 633, 637-38 (6th Cir. 2013) (loss of opportunity to become permanent resident is injury)).

---

[2] In *Thatikonda*, the court found that the jurisprudential considerations that ordinarily mitigate against standing for unadmitted, nonresident aliens challenging consular decisions in foreign countries were not present because plaintiff had lived and worked in the United States for several years before returning to country where she applied for a visa renewal. 2022 WL 425013 at *3.

Moreover, as plaintiffs point out, their connection to the United States is no more attenuated than Matushkina's connection:  Matushkina had obtained a visitor's visa to the U.S. in 2009 but withdrew her application and left the country upon arrival at O'Hare International Airport after a CBP officer deemed her inadmissible for having misrepresented a material fact in her application.  877 F.3d at 291.  Here, Ali Pak and Fatouraee have received multiple visas to the United States, including after they completed their compulsory military service in the IRGC, and they have visited their family in and established ties to the United States over the last several decades.  Dkt. 21 at 8-9 and dkt. 23 at 2.  The fact that the other visa-applicant plaintiffs were not previously approved for a visa is of little consequence because "jurisdiction is secure" where at least one plaintiff has standing.  *See Ezell*, 651 F.3d at 696 n.7.

Like the nonadmitted, foreign national plaintiff in *Matushkina*, the visa-applicant plaintiffs in this case had an interest in their admissibility to the United States, and the injury to that interest is apparent on the face of the complaint:  defendants denied plaintiffs' requests for visas because the visa-applicant plaintiffs were inadmissible under TRIG.  *Matushkina*, 877 F.3d at 293.  The visa-applicant plaintiffs also satisfy the other components of an injury in fact because their injuries are not hypothetical or conjectural and these injuries affect them "in a personal and individual way."  *Spokeo*, 578 U.S. at 339-40.  In addition, plaintiffs' injuries are fairly traceable to the challenged conduct of defendants, and a favorable decision in this court would redress these injuries by restoring to plaintiffs the *opportunity* to receive a visa, even though USCIS ultimately might not approve plaintiffs' applications.  *See Matushkina*, 877 F.3d at 294 (citing *Lujan*, 504 U.S. at 560-61 and *Kurapati*, 775 F.3d at 1259-60, for same proposition). Accordingly, I conclude that the visa-applicant plaintiffs have standing in this case.

## II.  Rule 12(b)(6) Challenges

The question raised by a 12(b)(6) motion is whether the plaintiffs' allegations provide fair notice of the claims and are sufficient to show that the possibility of relief is "plausible," that is, more than speculative.  *Bravo v. Midland Credit Management, Inc.*, 812 F.3d 599, 601-02 (7th Cir. 2016) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  Defendants contend that plaintiffs' claims are not justiciable[3] for two related reasons:   (1) sections 701(a)(1)-(2) of the APA preclude judicial review because immigration law commits decisions concerning visas and TRIG exemptions to the sole discretion of the consular officers and/or the Secretaries of State and Homeland Security; and (2) the consular nonreviewability doctrine precludes judicial review of consular visa decisions.  In the alternative, they argue that plaintiffs' allegations fail to state a constitutional or federal law claim.

As explained below, I find that judicial review is precluded in this case.  Therefore, it is unnecessary to consider defendants' remaining arguments concerning the merits of plaintiffs' claims.

---

[3] Issues of justiciability typically involve standing, ripeness, mootness, and the political question doctrine, all of which call the court's subject matter jurisdiction into account.  *See Whitford v. Gill*, 218 F. Supp. 3d 837, 928 (W.D. Wis. 2016) (vacated and remanded on other grounds) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated on other grounds by Lexmark Int'l Inc. v. Static Control Components*, 134 S.Ct. 1377, 1388 (2014), and Charles Alan Wright et al., *Federal Practice & Procedure* § 3529 (3d ed. 2008)).  However, as defendants point out, their arguments addressing consular nonreviewability and the discretion that courts afford immigration decisions are appropriately considered under Rule 12(b)(6) and not Rule 12(b)(1).  *See Allen v. Milas*, 896 F.3d 1094, 1102-07 (9th Cir. 2018); *Matushkina*, 877 F.3d at 294 n.2 ("We treat the doctrine of consular nonreviewability as a matter of a case's merits rather than the federal courts' subject matter jurisdiction."); *Morfin v. Tillerson*, 851 F.3d 710, 711 and 714 (7th Cir. 2017).

A.  **Background of Judicial Review in Immigration Context**

As plaintiffs point out, the APA creates a "basic presumption of judicial review [for] one suffering legal wrong because of agency action."  *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 139 S.Ct. 361, 370 (2018); *Sackett v. EPA*, 566 U.S. 120, 128 (2012); *see also* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."); § 704 ("[F]inal agency action for which there is no other adequate remedy in a court [is] subject to judicial review.").

However, the APA's right to review provision contains a qualifying clause that "[n]othing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702(1). In addition, the APA specifically provides that an agency action may not be challenged in court if "statutes preclude judicial review" or if the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2).

As described in the background section above, "Congress has delegated the power to determine who may enter the country to the Executive Branch, and courts generally have no authority to second-guess the Executive's decisions." *Yafai v. Pompeo*, 912 F.3d 1018, 1020 (7th Cir. 2019) (citing *Mandel*, 408 U.S. at 769-70); *see also Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156-57 (D.C. Cir. 1999) (detailing history of discretion granted to consular officers for visa processing).  The INA confers consular officers with exclusive jurisdiction to adjudicate visa applications, and ultimately, to issue or to refuse a visa.  *See Saavedra Bruno*, 197 F.3d at 1156-57; 8 U.S.C. §§ 1104(a), 1201(a).  Similarly, the decision whether a visa applicant qualifies for

a waiver or exemption is considered by the consular officer as part of the adjudication process, and the Secretaries of State and Homeland Security, in consultation with each other and with the Attorney General, have the sole and unreviewable discretion and authority to create and grant TRIG exemptions.  8 U.S.C. § 1182(d)(3)(B)(i).

Even prior to the passage of the APA, the Supreme Court recognized that the power to set policies regarding foreign nationals is "exercised exclusively by the political branches of government." *Saavedra Bruno*, 197 F.3d at 1159 (internal citations omitted).  To that end, and "[i]n view of the political nature of visa determinations and of the lack of any statute expressly authorizing judicial review of consular officers' actions, courts have applied what has become known as the doctrine of consular nonreviewability," *id.* at 1159, which "bars judicial review of visa decisions made by consular officials abroad," *Yafai*, 912 F.3d at 1020-21 (quoting *Matushkina*, 877 F.3d at 294).  "[T]he general rule [is] that decisions 'to issue or withhold a visa' are not reviewable in court 'unless Congress says otherwise.'"  *Matushkina*, 877 F.3d at 294 (quoting *Saavedra Bruno*, 197 F.3d at 1159).

### B.  Judicial Review of Plaintiffs' Claims

Plaintiffs attempt to avoid the APA's bar of judicial review and the consular nonreviewability doctrine by stating that they are not seeking review of any individual consular officer's decision but rather are challenging the systemic failures in the TRIG exemption process.  Specifically, they argue that defendants failed to fairly and consistently consider applicants for TRIG exemptions under the existing statutory and regulatory scheme.  As relief, plaintiffs seek the opportunity to apply for the TRIG exemption allowed by statute.

Federal courts have consistently rejected attacks on consular decisions—whatever form they take—and are not required to take plaintiffs' word that they are not challenging a visa denial. *Matushkina*, 877 F.3d at 295; *Garcia v. Baker*, 765 F. Supp. 426, 428 (N.D. Ill. 1990). Nonetheless, plaintiffs argue that the APA's bar on judicial review and the consular nonreviewability doctrine do not apply in their case because: (1) some courts have considered challenges to immigration-related programs, processes, and procedures; and (2) the Supreme Court has allowed constitutional challenges to consular decisions. I will address each possible exception in turn.

### 1. Programs, Processes, and Procedures

Plaintiffs cite several cases for the proposition that challenges to programs and processes are reviewable. Dkt. 21 at 12 (citing *Fiallo v. Bell*, 430 U.S. 787, 797-98 (1977) (challenging statutory scheme setting out special preference immigration status to aliens who qualify as children or parents of U.S. citizens or lawful permanent residents); *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (review of amnesty program permissible because statutory preclusion applied only to individual denials); *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993) (considering merits of challenge to Haitian repatriation program); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1019 (N.D. Cal. 2019) (review permissible in case challenging implementation of waiver process at consular posts). However, with the exception of *Emami*, none of these cases involve the discretionary decision to deny a visa application, and therefore, are not instructive in this case.

21

*Emami* involved DOS's guidance on processing waivers for individuals affected by the now-rescinded Presidential Proclamation 9645, which restricted the entry of foreign nationals from certain countries into the United States. The Northern District of California rejected the government's argument that the doctrine of consular nonreviewability precluded judicial review, finding that plaintiffs' allegations that "the government has flouted its own guidelines and statements about case-by-case determinations of waiver applications in favor of a policy of blanket denials" . . . "do not require review of an individual consular officer's decision." *Emami*, 365 F. Supp. 3d at 1018-19 (highlighting plaintiffs' express statements that they were not challenging individual consular decisions on the merits).

As a starting point, the *Emami* decision is not binding precedent in this circuit. More critically, *Emami* runs counter to the Seventh Circuit's holding in *Matushkina*, 877 F.3d at 295, that the consular nonreviewability doctrine applies "even to suits where a plaintiff seeks to challenge a visa decision indirectly" and regardless of plaintiffs' assurances that they were not challenging individual consular decisions. *Matushkina*, 877 F.3d at 295 (citing *Malyutin v. Rice*, 677 F. Supp. 2d 43, 46 (D.D.C. 2009) (applying doctrine to theory that visa denial obstructed plaintiff's access to state court because "the doctrine also applies where a plaintiff attempts to circumvent the doctrine by claiming [that] he is not seeking a review of the consular officer's decision, but is challenging some other, related aspect of the decision"), *aff'd*, 2010 WL 2710451 (D.C. Cir. July 6, 2010); *Al Makaaseb Gen. Trading Co. v. Christopher*, 1995 WL 110117, at *3 (S.D.N.Y. Mar. 13, 1995) (rejecting challenge to inclusion of visa applicant on lookout list because "such a challenge cannot be divorced from an attack of the decision itself"); *Garcia*, 765 F. Supp. at 428 (rejecting challenge of visa denial characterized as challenge to State

Department's legal opinion allegedly rendered contrary to law because courts "cannot review a consular officer's decision even upon allegations that the consular officer acted on erroneous information, that the INA did not authorize the officer's decisions, that the officer erroneously interpreted and applied the INA, or that the State Department failed to follow its own regulations.")).

The holding in *Garcia v. Baker*, which the court cites with approval in *Matushkina*, is particularly instructive. In that case, a mother and daughter sought a declaration that DOS's binding legal opinion upholding a consular official's determination was contrary to the Attorney General's interpretation of the law. The Northern District of Illinois rejected plaintiffs' attempt to avoid the doctrine of consular nonreviewability, observing that:

> First, courts have consistently rejected attacks on consular decisions, whatever form they take . . . . Second, it is the role of the executive, rather than the courts, to ensure that the Secretary of State follows the Attorney General's interpretations of law with respect to immigration . . . . Third, any decision we might render ordering the Secretary of State to follow the Attorney General's interpretations of law would not affect consular officers' decisions, because only consular officers can find facts or apply the law to facts with respect to visa applications . . . . Thus, there is a serious question as to whether granting plaintiffs' prayer for relief would achieve the result they seek.

*Garcia*, 765 F. Supp. at 428 (citations omitted).

*See also Chun v. Powell*, 223 F. Supp. 2d 204, 206-07 (D.D.C. 2002) (quoting same in support of view that "attempts to manufacture subject matter jurisdiction by recasting a complaint have consistently been rejected by the courts").

Here, the consular officers reviewed each visa-applicant plaintiff's application, denied the application, and either notified the applicant that they were ineligible for a waiver, did not respond when the applicant asked for an exemption, or told the applicant that they had to

contact DOS.  The parties agree, and the law makes clear, that visa applicants do not have any right to a TRIG exemption because that decision is left to the sole and unreviewable discretion of the secretaries of DOS and DHS.  Although plaintiffs argue that their respective embassies never gave them the opportunity to demonstrate that their military service was not a voluntary or knowing terrorist activity—and in some cases, actually gave them incorrect information about how to seek an exemption—the relevant statutes do not grant plaintiffs any right to a particular process with respect to waivers or exemptions.

Plaintiffs argue that:

- The FAM provides a list of factors a consular officer "must consider" in evaluating an exemption related to undesignated terrorist organizations, *see* 9 FAM 302.6-2(B)(3)(b)(2)[4];

- The INA "includes an orderly process [for other types of waivers] in which applicants are able to submit evidence to prove their eligibility, which evidence adjudicators are required to consider before arriving at a decision," *see* 8 U.S.C. §§ 1182(a)(9)(B)(v) (waiver of inadmissibility for unlawful presence in U.S.), 1182(h)(1)(B) (waiver of inadmissibility for marijuana possession), and 1182(i)(1) (waiver of inadmissibility for fraud or misrepresentation of fact); and

- After plaintiffs filed their complaint, defendants published a process by which consular officers can evaluate certain applicants for TRIG exemptions, *see* Exercise of Authority Under Section 212(d)(3)(B)(i) of the Immigration and Nationality Act, 87 Fed. Reg. 37523 (Jun. 23, 2022) (accessed at https://www.federalregister.gov/documents/2022/06/23/2022-13472/exercise-of-authority-under-section-212d3bi-of-the-immigration-and-nationality-act).

---

[4] Specifically, this section sets forth factors that consular officers must consider in determining whether a visa applicant can demonstrate by "clear and convincing evidence" that they did not know, and should not reasonably have known, that an undesignated organization was a terrorist organization. However, this provision is inapplicable in this case because the IRGC is a designated terrorist organization. *See* 9 FAM 302.6-2(B)(3)(b)(1) ("The phrase 'clear and convincing evidence' appears several times in INA 212(a)(3)(B) with reference to undesignated terrorist organizations." . . . "(Applicants are deemed to know that designated terrorist organizations are terrorist organizations, regardless of their actual knowledge or belief).").

24

The FAM and INA provisions cited by plaintiffs do not apply to TRIG exemptions for Tier I terrorist organizations.  Although the DOS/DHS notice clarifies that the TRIG bar in 8 U.S.C. 1182(a)(3)(B)(iv)(VI)(cc) does not apply to individuals providing insignificant or limited material support to a designated terrorist organization and identifies what an individual must demonstrate to qualify for an exemption, it specifically states that "[t]his exercise of authority creates no substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."  Exercise of Authority notice (accessed at https://www.federalregister.gov/d/2022-13472/p-16).  At most, these sources provide that exemptions *may* be considered to overcome ineligibility for past terrorist activity associated with a Tier I terrorist organization if the applicant acted under duress or without the relevant knowledge.

In any event, each of the visa applicants in this case made clear that they were seeking an exemption and the grounds on which they were seeking it (involuntary military service with a group not known to be a terrorist organization), and each of them was notified that they were found ineligible under INA § 212(a)(3)(B).  Even though some of the consular officers may not have pursued an exemption on behalf of the visa-applicant plaintiffs or may have misinformed the applicants about how to seek an exemption, the consular officers made individual decisions to deny the visa applications and to find the plaintiffs not eligible for a TRIG exemption.  These decisions—no matter how unfair or incorrect plaintiffs believe them to be—are unreviewable. *See Annachamy v. Holder*, 733 F.3d 254, 263 n.9 (9th Cir. 2013), *overruled on other grounds by Abdisalan v. Holder*, 774 F.3d 517 (9th Cir. 2014) (acknowledging that several commentators have questioned adequacy of duress waiver mechanism, including pronounced delays associated with

waiver process, but expressing "no opinion as to the efficacy of the waiver mechanism" because "[t]hat determination has been delegated solely to the Secretaries of State and of Homeland Security").  As the court explained in *Chun*, the nonreviewability doctrine

> applies even where it is alleged that the consular officer failed to follow regulations, *Burrafato v. Dep't of State*, 523 F.2d 554 (2d Cir.1975); where the applicant challenges the validity of the regulations on which the decision was based, *Ventura-Escamilla v. INS*, 647 F.2d 28 (9th Cir. 1981); or where the decision is alleged to have been based on a factual or legal error.
>
> *Chun*, 223 F. Supp. 2d at 207 (also citing *Centeno v. Schultz*, 817 F.2d 1212, 1213 (5th Cir. 1987)).

In addition, plaintiffs cite without discussion a narrow exception offered by *Musunuru v. Lynch*, 831 F.3d 880, 887-88 (7th Cir. 2016), in which the court of appeals held that 8 U.S.C. § 1252(a)(2)(B)(ii) (regarding judicial review of removal orders) does not preclude judicial review of purely procedural rulings during the adjudication of a visa petition.  *See Musunuru*, 831 F.3d at 888 ("[W]e are reviewing USCIS's decision to deny him the opportunity to challenge the revocation.  Ergo, we have jurisdiction to review Musunuru's claims."); *see also Calma v. Holder*, 663 F.3d 868, 876-77 (7th Cir. 2011) ("[T]here are identifiable circumstances under which a critical procedural step in a removal proceeding, such as the denial of a continuance that is sought for purposes of allowing another agency to complete its review, the denial of a motion to reconsider, a refusal to remand, or a refusal to reopen a case, lies within our jurisdiction even though we are barred from evaluating the BIA's ultimate decision.").

However, consistent with its approach in *Matushkina*, the Seventh Circuit has made clear that plaintiffs cannot challenge substantive decision-making and "evade a jurisdiction-stripping statute by repackaging [] substantive complaints as procedural objections."  *Doe v. McAleenan*,

926 F.3d 910, 911 (7th Cir. 2019).  Although "[c]ourts may review identifiable procedural rulings that don't implicate a petition's merits," *Musunuru* does not "open the door to challenging discretionary [decisions] on nominally 'procedural' grounds."  *Id.* at 915.  As discussed above, even though plaintiffs say they are challenging defendants' failure to adhere to their procedures and processes, they have not identified a procedural ruling like those at issue in *Musunuru* and *Calma*.

In sum, I conclude that plaintiffs' allegations that defendants failed to properly apply and adhere to their own TRIG exemption process constitute an indirect attack on consular decisions that runs afoul of the consular nonreviewability doctrine and the APA's general preclusion of judicial review of such decisions.

### 2.  Constitutional claims

Plaintiffs rely on the Supreme Court's decision in *Mandel*, 408 U.S. at 770, and Justice Kennedy's concurrence in *Kerry v. Din*, 576 U.S. 86, 88 (2015) (plurality decision), for the propositions that the doctrine of consular nonreviewability does not apply to constitutional claims, and that U.S. citizens have a procedural due process right with respect to a family member's visa application.  Dkt. 21 at 12 and 25.  The Seventh Circuit has recognized that the Supreme Court has "identified a limited exception to the nonreviewability doctrine when the visa denial implicates a constitutional right of a American citizen."  *Yafai*, 912 F.3d at 1021 (citing *Mandel*, 408 U.S. at 769-70; *Morfin*, 851 F.3d at 711).  However, "even in that circumstance, a court may not disturb the consular officer's decision if the reason given is 'facially legitimate and bona fide.'"  *Id.* (citing *Mandel*, 408 U.S. at 769); *see also Mandel*, 408

27

U.S. at 770 ("We hold that when the Executive exercises this power [to exclude foreign nationals] negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.").  "All we can do is to look at the face of the decision, see if the officer cited a proper ground under the statute, and ensure that no other applicable constitutional limitations are violated.  Once that is done, if the undisputed record includes facts that would support that ground, our task is over."  *Hazama*, 851 F.3d at 709.

Plaintiffs invoke this limited exception to the doctrine of consular nonreviewability on the ground that denying the visa-applicant plaintiffs a TRIG exemption implicates the family-member plaintiffs' constitutional right to family integrity.[5]  However, "[t]he status of this right is uncertain."  *Yafai*, 912 F.3d at 1021.  In *Din*, 576 U.S. at 88, a plurality of the Supreme Court said that no such right exists, but the Seventh Circuit has avoided taking a position on this issue.  *See Yafai*, 912 F.3d at 1021; *Hazama*, 851 F.3d at 709.  In any event, even if the denial of some of the visa-applicant plaintiffs' applications implicated a constitutional right of their U.S. citizen family members, these claims fail because the consular decisions were facially legitimate and bona fide.

As the Seventh Circuit has explained:

> For a consular officer's decision to be facially legitimate and bona fide, the consular officer must identify (1) a valid statute of inadmissibility and (2) the necessary "discrete factual predicates" under the statute.  *See Din*, 135 S.Ct. at 2140-41 (Kennedy, J.,

---

[5] As defendants point out, this limited exception would not apply to Melody Pak, who is a permanent resident.

concurring).  When a statute "specifies discrete factual predicates that the consular officer must find to exist before denying a visa," the citation of the statutory predicates is itself sufficient.  *Id.* at 2141.  In other words, the consular officer need not disclose the underlying facts that led him to conclude that the statute was satisfied.  *Id*. ("*Mandel* instructs us not to 'look behind' the Government's exclusion of [the alien spouse] for additional factual details beyond what its express reliance on [the relevant statutory provision] encompassed.") (citing *Mandel*, 408 U.S. at 770, 92 S.Ct. 2576)); *see also Morfin*, 851 F.3d at 713-14 (explaining that citation to the statutory requirements supplies a legitimate reason for denying a visa application).

*Yafai*, 912 F.3d at 1021.

Here, the consular officers all provided a facially legitimate and bona fide reason for denying the

visa applications by citing a valid statutory basis:  8 U.S.C. § 1182(a)(3)(B).  That statutory

provision  "establish[es] specific criteria for determining terrorism-related inadmissibility," *Din*,

576 U.S. at 104, and the undisputed record includes facts that would support that ground of

inadmissibility.  The consular officers were well-aware of the visa-applicant plaintiffs' past service

in the IRGC, as well as their claims that their service was involuntary and occurred prior to the

IRGC's designation as a terrorist organization.

In the context of arguing that they have adequately plead APA violations, plaintiffs state

that their refusal letters cite only the general TRIG statute with no subsection.  Dkt. 21 at 23.

However, as Justice Kennedy observed in his concurrence in *Din*, 576 U.S. at 104-06:

The consular officer's citation of [§ 1182(a)(3)(B)] suffices to show that the denial rested on a determination that Din's husband did not satisfy the statute's requirements. . . .  The Government . . . was not required, as Din claims, to point to a more specific provision within § 1182(a)(3)(B).  . . .  The statute generally requires the Government to provide an alien denied a visa with the "specific provision or provisions of law under which the alien is inadmissible," § 1182(b)(1); but this notice requirement does not

apply when, as in this case, a visa application is denied due to terrorism or national security concerns. § 1182(b)(3).

Absent an affirmative showing of bad faith on the part of the consular officers, which plaintiffs do not make or even discuss, it is unnecessary to look further for additional factual details to support the consulate's reliance on § 1182(a)(3)(B). *Id.* at 105; *Yafai*, 912 F.3d at 1022 (finding same and noting that making "affirmative showing of bad faith" requires plaintiff to point to something more than an unfavorable consular decision).

As noted at the outset, on the facts known to this court, it is left to wonder why TRIG exemptions were not granted to these applicants, but this is cold comfort at best because the court cannot overturn the challenged decisions.


ORDER

IT IS ORDERED that defendants' motion to dismiss, dkt. 16, is GRANTED IN PART and DENIED IN PART:

(1) Defendants' motion to dismiss the visa-applicant plaintiffs under Fed. R. Civ. P. 12(b)(1) for lack of standing is DENIED.

(2) Plaintiffs' complaint is DISMISSED under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

Entered this 3rd day of January, 2023.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge